AMERICAN NATIONAL FIRE INSURANCE ) Appeal from the

COMPANY, Indiv. and as Subrogee ) Circuit Court of

of Camosy, Inc., ) Cook County.

)

Plaintiff-Appellant, )

)

) No. 98 CH 3863

)

NATIONAL UNION FIRE INSURANCE )

COMPANY OF PITTSBURGH, PA, ) Honorable

) Stephen A. Schiller,

Defendant-Appellee. ) Judge Presiding.

JUSTICE REID delivered the opinion of the court:

In this matter, the trial court denied appellant American National Fire Insurance Co.'s (American) motion for summary judgment and granted appellee, National Union Fire Insurance Company of Pittsburgh, PA.'s (National) cross-motion for summary judgment.  On appeal, American argues that the trial court erred when it determined that National was not required to provide coverage under the insurance policy at issue because it received late notice and, as a consequence, did not owe anything to American for the costs of the defense and settlement of the underlying litigation.  For the reasons that follow, we affirm the trial court's decision.

BACKGROUND

Camosy, Inc. (Camosy), was the general contractor on a Federal Aviation Administration construction project (the Tracon Facility job), in Elgin, Illinois.  On February 5, 1993, Camosy entered into a contract with Zalk-Josephs Fabricators, Inc. (Zalk-Josephs), in which Zalk-Josephs agreed to act as a subcontractor to Camosy for the Tracon Facility job.  The subcontract agreement required Zalk-Josephs to procure and maintain insurance coverage including a general liability policy, with Camosy as an additional insured.  In accordance with the agreement, Zalk-Josephs procured general liability coverage from National with Camosy as an additional insured.  Camosy was subsequently provided with a certificate of insurance regarding this policy.

Thereafter, Zalk-Josephs subcontracted part of the Tracon Facility job to Area Erectors, Inc. (Area Erectors).  American provided general liability insurance to Area Erectors.  Camosy and Zalk-Josephs qualified as additional insureds under the American policy.

On September 9, 1993, an employee of Area Erectors, Maximo Gonzalez, was injured while working at the Tracon Facility jobsite.  On January 13, 1995, Gonzalez filed suit against Camosy seeking damages for his injuries.  Gonzalez alleged that he was injured as a result of Camosy's: (1) violation of the Structural Work Act (740 ILCS 150/1 
et
 
seq
. (West 1994)) and (2) negligence.  On May 20, 1996, Gonzalez amended his complaint to add Zalk-Josephs as a defendant.

There were subsequent "targeted tenders" and/or attempted "targeted tenders" downstream to both National and American.  Camosy reported the Gonzalez lawsuit to its insurer, Continental Loss Adjusting (Continental).  In a letter dated February 3, 1995, Continental advised Zalk-Josephs that it wished to tender Camosy's defense in the Gonzalez lawsuit to Zalk-Josephs' insurer, National.  In a letter dated February 6, 1995, Zalk-Josephs informed Continental that it was declining Continental's request.  Zalk-Josephs explained that it was making this decision: (1) as a result of the decision reached in 
Institute of London Underwriters v. Hartford Fire Insurance Co.
, 234 Ill. App. 3d 70 (1992), (2) because it desired that the National policy "not be impaired" and (3) due to its expectation that American would defend and indemnify Camosy.  Zalk-Josephs then tendered its defense along with Camosy's to American.

Initially, American refused Camosy's tender of defense as made by Zalk-Josephs.  Thereafter, Camosy requested coverage from American on its own behalf.  Subsequently, American agreed to provide coverage and assumed Camosy's defense.

Although American had accepted Camosy's tender of defense, Camosy continued to communicate with Zalk-Josephs regarding its initial desire that its defense be tendered to National.  In a letter dated December 12, 1997, counsel for Camosy requested that Zalk-Josephs answer the following questions: (1) whether Camosy had coverage with National and (2) assuming that Camosy was covered by National, why National had refused to tender a defense to Camosy.  On January 7, 1998, Continental also sent similar correspondence to Zalk-Josephs.  Zalk-Josephs did not respond to either letter.  At no time did Camosy make a direct "targeted tender" to National prior to this lawsuit being filed.

On March 25, 1998, Camosy filed a complaint for declaratory judgment against both Zalk-Josephs and National.  In the complaint, Camosy sought a determination that: (1) National owed a duty to defend and indemnify it with regards to the Gonzalez suit or, in the alternative, (2) Zalk-Josephs was in breach of its contractual obligation to provide it with insurance coverage.

On May 5, 1998, American, as the insurer for Camosy and Zalk-Josephs, settled the Gonzalez suit.  Thereafter, on October 13, 1998, American, individually and as the subrogee of Camosy, filed an amended complaint for declaratory judgment against National.  In the complaint, American sought to be reimbursed for the costs it incurred regarding the Gonzalez suit.  American alleged that it: (1) was subrogated to Camosy's rights and that National owed a duty to defend and indemnify Camosy with respect to the Gonzales suit or, in the alternative, (2) that it had a right to recover based on the doctrine of equitable contribution.   On July 11, 2001, American filed a motion for summary judgment.  National then filed a cross-motion for summary judgment on July 16, 2001.  On September 28, 2001, the trial court granted National's cross-motion for summary judgment and denied American's motion.  

The issues presented in this case are whether: (1) the trial court correctly granted summary judgment when it determined that National did not receive proper notice of the Gonzalez suit and therefore was not required to provide coverage to Camosy, as an additional insured, under Zalk-Josephs' insurance policy, (2) Camosy made a timely "targeted tender" to National by notifying Zalk-Josephs of its intentions and (3) the self-insured retention (SIR) endorsement in National's insurance policy applies to Camosy.

ANALYSIS

I

Summary judgment is proper where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  735 ILCS 5/2-1005(c)(West 2000); 
Travelers Insurance Co. v. Eljer Manufacturing, Inc.
, 197 Ill. 2d 278, 292 (2001).  In appeals from summary judgment rulings, our review is 
de
 
novo
.  
Travelers
, 197 Ill. 2d at 292.

National contends the trial court's decision to grant its cross-motion for summary judgment is proper.  Relying on the decision reached in 
Institute of London
, National maintains that an insured has the right to elect which of its insurers will defend it in a lawsuit.  National asserts that Zalk-Josephs was the named insured under National's policy and was an additional insured under American's policy.  Accordingly, National argues that Zalk-Josephs had the right to make a "targeted tender" and thereby select which insurer it desired to defend and indemnify it in the Gonzalez suit.  

National avers that when an insured makes this designation, the selected insurer is then precluded from being reimbursed by the other insurers for its costs under a theory of equitable contribution.  The right to equitable contribution arises when one insurer pays money for the benefit of another insurer.  
Royal Globe Insurance Co. v. Aetna Insurance Co.
, 82 Ill. App. 3d 1003, 1006 (1980).  The doctrine of equitable contribution permits an insurer that has paid the entire loss to be reimbursed by other insurers that are also liable for the loss.  
Liberty Mutual Insurance Co. v. Westfield Insurance Co.
, 301 Ill. App. 3d 49, 52 (1998). 

Relying further on the rationale of 
Institute of London
, National also maintains that Zalk-Josephs had the right to preserve its coverage with National by "downstreaming" Camosy's tender of defense to American.  Consequently, National contends that it is not required to reimburse American since Zalk-Josephs 
and
 
Camosy
 made "targeted tenders" of their defenses solely to American. 

In 
Institute of London
, the court was faced with the question of when two insurance policies potentially apply to a loss, may an insured elect which of its insurers is to defend and indemnify the claim by tendering its defense to one insurer and not the other and thereby foreclose the settling insurer from obtaining contribution from the nonsettling insurer?

The undisputed facts in 
Institute of London
 revealed that Hartford Fire Insurance Company (Hartford) provided comprehensive liability insurance to Great Lakes Towing Company (Great Lakes).  Great Lakes employed Thatcher Engineering Corporation (Thatcher) to perform repairs on its premises.  The agreement between the parties required Thatcher to have Great Lakes named as an additional insured on Thatcher's liability insurance policy.  Accordingly, Thatcher caused Great Lakes to be named as an additional insured on its insurance policy with the Institute of London Underwriters (Institute).  The Hartford policy contained an "other insurance" clause which required Hartford to contribute equally to any loss covered by another primary insurer, while Institute's policy did not.  
Institute of London
, 234 Ill. App. 3d at 71.

Thereafter, a Thatcher employee was killed while working on the project for Great Lakes.  His representative brought suit against Great Lakes.  Great Lakes then tendered its defense to Institute.  Great Lakes also notified its insurer, Hartford, of the suit but never requested that Hartford defend or indemnify it.  Instead, Great Lakes preferred that Institute incur the costs for its defense and indemnification.  
Institute of London
, 234 Ill. App. 3d at 71-72.

A settlement in the suit was reached and Institute, without Great Lakes' instruction or authorization, requested that Hartford contribute half of the settlement.  Hartford, as requested by Great Lakes, refused.  On appeal, Hartford argued that equitable contribution did not apply because Great Lakes never tendered its defense to Hartford and Great Lakes never requested that Hartford defend or indemnify the claim.  
Institute of London
, 234 Ill. App. 3d at 73.

T
he 
Institute of London
 court determined that Illinois law requires a tender of defense by a sophisticated insured to an insurer before the insurer is required to defend or indemnify a claim.  
Institute of London
, 234 Ill. App. 3d at 76.  The court also found that an insured has the right to choose which policy will apply.  
Institute of London
, 234 Ill. App. 3d at 76.  In reaching this decision, the court stated:

"In the case before us the only request for Hartford's participation came from the Institute, not the insured, ***.  *** Hartford was asked only to contribute to a settlement, not defend the suit.  Therefore, in this case, * * * the insured's refusal or failure to tender the defense of the action to Hartford excused Hartford's duty to perform under its policy or to contribute to a settlement procured by a co-insurer."  
Institute of London
, 234 Ill. App. 3d at 76.

In recognizing an insured's right to choose between two insurers whose policies provide potential coverage, the court noted that Great Lakes had bargained for coverage under Institute's policy procured by Thatcher.  In that regard the court stated: 

"Great Lakes had bargained with Thatcher to be an additional insured in its liability policy for the construction project Thatcher was to perform on Great Lakes' premises.  Great Lakes did not tender its defense to Hartford because it concluded it was not responsible for the accident resulting in the death of Thatcher's employee, Garcia, and that Thatcher's insurer, the Institute, was the appropriate carrier to respond to the Garcia claim.  Great Lakes may well have feared that if the loss were attributed to its policy with Hartford the result might be a rise in premiums or cancellation of its policy.  This factor alone suggests the insured ought to have the right to seek or not to seek an insurer's participation in a claim as the insured chooses when more than one carrier's policy covers the loss."  
Institute of London
, 234 Ill. App. 3d at 78-79.

In 
Cincinnati Cos. v. West American Insurance Co.
, 183 Ill. 2d 317, 324 (1998), the court considered what is necessary to trigger an insurer's duty to defend and held that the duty arises with actual notice of a claim against an insured, regardless of the insured's level of sophistication.  In reaching 

that result, the court, relying on 
Institute of London,
 stated:

"Where the insured makes such a designation, the duty to defend falls solely on the selected insurer.  That insurer may not in turn seek equitable contribution from the other insurers who were not designated by the insured.  
Institute of London
, 234 Ill. App. 3d at 79.  This rule is intended to protect the insured's right to knowingly forgo an insurer's involvement.  
Institute of London
, 234 Ill. App. 3d at 79."  
Cincinnati
, 183 Ill. 2d at 324.   

The 
Cincinnati
 court concluded that "an insured may knowingly forgo the insurer's assistance by instructing the insurer not to involve itself in the litigation.  The insurer would then be relieved of its obligation to the insured with regard to that claim."  
Cincinnati
, 183 Ill. 2d at 326.

Subsequently, in 
John Burns Construction Co. v. Indiana Insurance Co.
, 189 Ill. 2d 570 (2000), the court was faced with a similar question.  There, the appellant, John Burns Construction Company (Burns), entered into a subcontract with Sal Barba Asphalt Paving, Inc. (Barba), to pave a parking lot.  The subcontract required Barba to maintain liability insurance for Burns.  Pursuant to the contract, Barba had Burns added as an additional insured to its policy with its insurer, Indiana Insurance Company (Indiana).  An individual subsequently fell in the aforementioned parking lot and alleged that his injuries occurred as a result of the parking lot being improperly paved.  The individual filed suit against Burns.  
John Burns
, 189 Ill. 2d at 571.

Burns initially tendered its defense to Indiana.  However, Indiana refused to accept the tender.  In response, Burns tendered its defense to it own insurer, Royal Insurance Company (Royal).  Thereafter, Burns and Royal filed an action for a declaratory judgment that Indiana defend and indemnify Burns in the underlying action.  In a counterclaim for declaratory judgment, Indiana argued Royal was required to share the defense since the Indiana policy contained an "other insurance" provision.  Indiana requested that Royal contribute equally to the costs it incurred.  
John Burns
, 189 Ill. 2d at 571-72.

The 
John Burns
 court determined that Burns had the right to choose which insurer would be required to defend and indemnify it in the underlying action and that there was nothing in the relevant policy which limited Burns' right to make this choice.  
John Burns
, 189 Ill. 2d at 574.  The court stated that it agreed with the reasoning of the decisions reached in 
Bituminous Casualty Corp. v. Royal Insurance Co. of America
, 301 Ill. App. 3d 720 (1998), and  
Alcan United, Inc. v. West Bend Mutual Insurance Co.
, 303 Ill. App. 3d 72 (1999), which involved "other insurance" clauses.  Quoting from the 
Alcan United
 decision, the 
John Burns
 court stated:  

"'Thus, in accordance with 
Bituminous Casualty
 and 
Institute of London
, we hold an "other insurance" clause in a policy will not automatically reach into coverages provided under other policies merely because such other policies are in existence.  The insured still must be given the right to determine whether it wishes to invoke its rights to such other coverages before those coverages become accessible under the "other insurance" provision of a triggered policy.'"  
John Burns
, 189 Ill. 2d at 577-78, quoting 
Alcan United
, 303 Ill. App. 3d at 81.

In 
Alcan United
, the court also held that the insured's right to choose encompasses the right to deactivate coverage with an insurer previously selected for purposes of invoking exclusive coverage with another insurer.  
Alcan United
, 303 Ill. App. 3d at 82.  Furthermore, the court in 
Richard Marker Associates v. Pekin Insurance Co.
, 318 Ill. App. 3d 1137, 1143-44 (2001), relying on the decision reached in 
Alcan United
, also determined that an insured, who had tendered his defense to two insurers, had the right to subsequently withdraw his tender from one insurer and forego its coverage.  
Richard Marker
, 318 Ill. App. 3d at 1143-44.

Here, National is correct when it argues that Zalk-Josephs had the right to select which insurer it wanted to defend and indemnify it with regards to the Gonzalez suit.  Under the decision reached in 
John Burns
 and its predecessors, Zalk-Josephs had the right to tender its defense to either its primary insurer, National, or because Zalk-Josephs was an additional insured on the sub-subcontractor Area Erector's policy, Zalk-Josephs could tender its defense to American.  However, using the same rationale, Camosy also had the right as an insured to choose the insurer of its choice to defend and indemnify it in the Gonzalez lawsuit.

Camosy's primary insurer was Continental.  Camosy was also an additional insured on National's and American's policies.  As such, Camosy had the right to select either Continental, National or American to defend and indemnify it in the Gonzalez suit.  Zalk-Josephs did not have the right to interfere with Camosy's choice of insurer.  

However, that stated, Zalk-Josephs was not National's agent, and consequently, it was Camosy's responsibility to tender its defense directly to National and not to Zalk-Josephs. In 
Cincinnati Cos.
, our supreme court held that an insurer's duty to defend arises with actual notice of a claim against an insured, regardless of the insured's level of sophistication.  
Cincinnati Cos.
, 183 Ill. 2d at 324, 701 N.E.2d at 502.  This court has held that when an insurer receives notice of a suit against one of their insureds from the attorney for the plaintiffs in that suit, this constitutes "actual notice" under 
Cincinnati Cos.
.  
Employees Reinsurance Corp. v. E. Miller Insurance Agency, Inc.
, 332 Ill. App. 3d 326, 339 (2002).  Further, in 
Alcan United, Inc. v. West Bend Mutual Insurance Co.
, 303 Ill. App. 3d 72, 84 (1999), this court held that when an insurer is the recipient of a "targeted tender" by an additional insured's own insurer, this also, constitutes actual notice under 
Cincinnati Cos.
 because the insured was made aware that a defense may be required.  Here, it is uncontested that National did not receive any notice until Camosy filed suit in 
this declaratory judgment action. 
 However, at this point, Camosy was precluded from tendering its defense to National as a result of late notice.

It is well settled that when an underlying complaint presents an issue of potential insurance coverage and the insurer believes that the policy does not cover the claim, the insurer may not refuse to defend the insured but must either defend the suit under a res
ervation of rights or seek a declaration of no coverage.  
Peerless Enterprise, Inc. v. Kruse
, 317 Ill. App. 3d 133, 145 (2000), citing 
Mobile Oil Corp. v. Maryland Casualty Co.
, 288 Ill. App. 3d 743, 754 (1997).
 
 When an insurer fails to act in either fashion and wrongfully denies coverage, the insurer is estopped from raising policy defenses to coverage.  
Peerless
, 317
 Ill. App. 3d at 146, citing 
Mobile Oil Corp.
, 288 Ill. App. 3d at 754
.
 

This estoppel doctrine applies only where an insurer has breached its duty to defend.  Thus, a court inquires whether the insurer had a duty to defend and whether it breached that duty.  
Employers Insurance of Wausau v. Ehlco Liquidating Trust
, 186 Ill. 2d 127, 151 (1999)
, citing 
Clemmons v. Travelers Insurance Co.
, 88 Ill. 2d 469, 475-78 (1981).

Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend or if the insurer's duty to defend was not properly triggered. 
 
These circumstances include where the insurer was given no opportunity to defend; where there was no insurance policy in existence; and where, when the policy and the complaint are compared, there clearly was no coverage or potential for coverage.  
Ehlco
, 186 Ill. 2d at 151, citing 
La Rotunda v. Royal Globe Insurance Co.
, 87 Ill. App. 3d 446, 452 (1980), and 
McFadyen v. North River Insurance Co.
, 62 Ill. App. 2d 164, 171 (1965).

The notice requirement in the insurance policy between Zalk-Josephs and National states:

"2.  Duties in the Event of Occurrence, Claim or Suit.

a.   You must see to it that we are notified as soon as     practicable of an 'occurrence' or an offense which may result in a claim.  To the extent possible, notice should include:

(1) How, when and where the 'occurrence' or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the 'occurrence' or offense.

b. If a claim is made or 'suit' is brought against any insured, you must;

(1) Immediately record the specifics of the claim or 'suit' and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or 'suit' as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit;'

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or 'suit;' and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

National argues that it was not required to provide coverage under the policy due to Camosy's failure to adhere to the notice provisions in sections 2(a) and (b).  In response, American contends that only the named insured, Zalk-Josephs, was required to adhere to the notice requirements of sections 2(a) and (b).  In particular, Zalk-Josephs argues that the "you" which appears in sections 2(a) and (b) refers to the named insured only and not to additional insureds.  

The terms "you," "we" and "us" are defined by the insurance policy.  Specifically, the National policy states:

"Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  The words 'we,' 'us' and 'our' refer to the company providing this insurance."

The declaration page of the National policy references Pettibone Corporation as the named insured.  The policy also includes a named insured endorsement designating other entities including, Zalk-Josephs, as named insureds.  Camosy is not named as a named insured in the endorsement.  Consequently, American maintains that Camosy, which qualified as an additional insured and not a named insured under the policy, had no obligation to comply with the notice provisions listed in sections 2(a) and (b).

"The construction of an insurance policy is a question of law subject to 
de
 
novo
 review.  
American States Insurance Co. v. Koloms
, 177 Ill. 2d 473, 479-80 (1997).  In construing the language of an insurance policy, a court must ascertain and give effect to the intention of the parties as expressed in their agreement.  
Koloms
, 177 Ill. 2d at 479.  To that end, terms utilized in the policy are accorded their plain and ordinary meaning (
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 108 (1992)) unless specifically defined in the policy, in which case they will be given the meaning as defined in the policy.  In addition, a court must read the policy as a whole and consider the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.  
Koloms
, 177 Ill. 2d at 479.  Provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer.  
Koloms
, 177 Ill. 2d at 479; 
National Union Fire Insurance Co. v. Glenview Park District
, 158 Ill. 2d 116, 122 (1994).  Moreover, all doubts and ambiguities in the policy language must be construed in favor of the insured.  
United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.
, 144 Ill. 2d 64, 74 (1991)."  
Brile v. Estate of Brile
, 296 Ill. App. 3d 661, 666 (1998).

American is correct.  Sections 2(a) and (b) specifically require "you," which is the named insured, Zalk-Josephs, to notify National of an occurrence or a claim.  Camosy was not a named insured under the National policy.  Consequently, Camosy could not have violated sections 2(a) and (b) of the policy. 

However, the trial court's decision to grant National's cross-motion for summary judgment was still proper because the notice provisions in sections 2(c)(1) and 2(d) were violated.   Although National did not argue that Camosy violated sections 2(c)(1) and 2(d) in its motion for summary judgment, this court may affirm a grant of summary judgment on any basis in the record.  
Fabiano v. City of Palos Hills
, 336 Ill. App. 3d 635, 641 (2002).

The notice provision found in section 2(c)(1) of the policy was violated as a result of Camosy's failure to 
immediately
 send National copies of any demands, notices, summonses or legal papers it received in connection with the Gonzalez suit.  In an affidavit dated November 19, 1999, Douglass Dully, a claim director of AIG Claim Services, Inc., the authorized representative of National, stated that National's first notice of the Gonzalez suit occurred on or about April 9, 1998, when National was served with Camosy's complaint for declaratory judgment.  Douglass' assertion is undisputed.  Consequently, National received notice of the Gonzalez suit a little more than three years after the suit was filed.  This is clearly late notice under the policy.  

Section 2(c)(1) requires the named insured and "any other insured" to adhere to the notice provision.  Zalk-Josephs is not National's agent.  Although, Camosy notified Zalk-Josephs of the Gonzalez suit and attempted to have Zalk-Josephs tender its defense to National, this was insufficient under the policy.  Camosy had an obligation to contact National directly to advise it of Camosy's "targeted tender" and immediately provide it with the relevant documents.  Camosy notified everyone except for National.  

Camosy was provided with a certificate of insurance which set forth the coverage which National was extending to Zalk-Josephs and to it as an additional insured.  With this information, Camosy could have easily notified National of its request for a defense together with the specifics of the Gonzales claim.  Camosy failed to do so and its actions clearly violated the notice provision in section 2(c)(1). 

Furthermore, 
the notice provision in section 2(d) of the policy was violated when American unilaterally decided to settle the Gonzalez suit.  Section 2(d) states "no insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."  American, which assumed Camosy's defense, settled the Gonzalez suit without National's consent.  This action clearly violated section 2(d) of the policy. 

Nevertheless, American contends that National is estopped from raising its coverage defense.  We do not agree with American's assertion.  Instead, we find that National is not estopped from asserting its coverage defenses because its duty to defend was never triggered.
  

On January 13, 1995, Gonzalez filed suit.  On February 3, 1995, Camosy through Continental informed Zalk-Josephs of the Gonzalez suit and its desire that Camosy's defense be tendered to National.  Three years later, National was given its first notice of the Gonzalez suit 
when it was served with the complaint in this declaratory judgment action,
 on 
April 9, 1998
.  
Less than a month later, on May 5, 1998, American settled the Gonzalez suit.  Consequently, National's duty to defend was never triggered because it was not given an opportunity to participate in the Gonzalez suit.  
As such, the estoppel doctrine is inapplicable in this matter and the trial court's decision is proper.
  
Northern Insurance Co. of New York v. City of Chicago
, 325 Ill. App. 3d 1086, 1094-96 (2001)(city's 2½-year delay in notifying insurer of lawsuit and settling the suit after insurer denied coverage relieved insurer of duty to defend, consequently estoppel could not be applied against insurer).

II

Although we have found that 
National was not required to provide coverage under its insurance policy to Camosy because it received late notice, we will also address the issue of whether 
the SIR endorsement in the National insurance policy would apply  to Camosy due to the fact that this is an action for a declaratory judgment.

The SIR endorsement
 in National's insurance policy provides in relevant part:

"1.  In consideration of the premium charged, it is agreed that the Limits of Insurance for the coverages will apply excess of 
$150,000
 (All other entities including Spartan Tool), per occurrence with a $2,250,000 aggregate, Self-Insured Retention (hereinafter referred to as the 'Retention Amount').

*  *  *

4.  We shall have the right but not the duty to participate with you at our own expense in the defense or settlement of any claim or suit seeking damages covered under this policy.  In the event of a claim or suit which in our reasonable judgment may result in payments, including Supplementary Payment, in an amount in excess of the Retention Amount, we may assume control of the defense or settlement of such claim or suit.  You will continue to be responsible for the payment of the Retention Amount."

The insuring agreement in the policy states:

"1.  Insuring Agreement.

a.
   We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend any 'suit' seeking those damages.  We may at our discretion investigate any 'occurrence' and settle any claim or 'suit' that may result."

Here, the SIR applies only to the named insured.  The SIR endorsement states: "
You
 will continue to be responsible for the payment of the Retention Amount." (Emphasis added.)
  As discussed earlier, the "you" in the National insurance policy refers only to the named insured, Zalk-Josephs, and not to additional insureds, such as Camosy.  As such, this provision does not apply to Camosy.

CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

HARTIGAN, J., concurs.

QUINN, J., specially concurs.

JUSTICE QUINN, specially concurring.

I concur with the holdings in this opinion.  The uncontroverted fact that National received notice of the Gonzalez suit more than three years after the suit was filed relieved National of any duty to defend Camosy.  I write separately to again express my concern with the "targeted tender rule" as promulgated by our supreme court in 
John Burns Construction Co. v. Indiana Insurance Co.
, 189 Ill. 2d 570, 727 N.E. 2d 211 (2000).  There, the court held that insureds have the right to select which concurrent primary insurers must respond to a particular suit or claim by making a targeted tender to those insurers.  The targeted insurers have no right to seek contribution from the unselected insurers, even if those insurers have notice of the claim and even if the targeted insurers'  policies with the insured contain "other insurance" clauses.

In the 3½ years since 
Burns
 was decided, it has only been cited twice by Illinois courts: 
Richard Marker Associates v. Pekin Insurance Co.
, 318 Ill. App. 3d 1137, 1141 (2001), and 
Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange
, 325 Ill. App. 3d 970, 976, 758 N.E. 2d 353 (2001).  Consequently, the parameters of the targeted tender rule have not been spelled out.  However, certain issues have been raised by legal commentators.  In 
Chicago Hospital Risk Pooling
, I wrote a concurrence in which I suggested:

"[T]he amount and nature of the coverage provided should be determined by the language of the policy issued by the insurer to whom tender has been made.  If that policy provides for equitable contribution from other insurers covering the same risk, that policy's provision should control."  
Chicago Hospital Risk Pooling
, 325 Ill. App. 3d at 986 (Quinn, J., specially concurring). 

The targeted tender rule gives policyholders rights not afforded to them in the terms and conditions of the policy.  These rights include the ability to target one policy over another to defend a claim or pay a loss.  Insurers are unable to enforce the "other insurance" clause or to enforce provisions in the policy permitting them to seek equitable contribution from other insurers.

In 
Constitutional Concerns Over the Exclusive Tender Rule in Illinois
, 18 DuPage County Bar Association BRIEF (March 2003), author Richard Hodyl, Jr., posited that the targeted tender rule is violative of article I, section 10, of the United States Constitution, which provides that no state shall pass any bill or law that impairs the obligations of parties to contracts.  He also argues that the rule similarly violates article I, section 16, of the Illinois Constitution:

"
§ 16. EX POST FACTO
 
LAWS AND IMPAIRING CONTRACTS

No ex post facto law, or law impairing the obligation of contracts or making an irrevocable grant of special privileges or immunities, shall be passed."  Ill.  Const. 1970, art. I, §16.

Hodyl points out that our supreme court has long held that our state constitution provides a right to enter into private contracts without state interference: 

"[Any unilateral alteration of a private contract by an Illinois court] would deny to the parties to the contract the equal protection of the laws and abridge their privileges as citizens of the United States, and deprive them, without due process of law, of the liberty of making contracts outside the State in regard to their property."  
Walker v. Lovitt
, 250 Ill. 543, 549, 95 N.E. 2d 631 (1911).

In 
Excess-Primary Insurer Obligations and the Rights of the Insured
, 69 Defense Counsel Journal, 315 (2002), Thomas M. Hamilton and Troy A. Stark, the authors, consider, among other issues, the potential impact the targeted tender rule may have on the relationship between primary and excess insurers.  The authors first explain the concepts of horizontal and vertical exhaustion.  Horizontal exhaustion "typically involves an insured who has multiple primary and excess policies covering the same risk.  If a covered claim occurs, the theory of horizontal exhaustion holds that the insured must exhaust all available primary policy limits before invoking excess coverage.  In contrast, vertical exhaustion allows an insured to seek coverage from an excess insurer as long as the insurance policies immediately beneath that excess policy, as identified in the excess policy's declaration page, have been exhausted, regardless of whether other primary insurance may apply."  69 Def. Couns. J. at 320.

In 
United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 643 N.E. 2d 1226, 1261 (1994), the court rejected the argument that "vertical exhaustion" applied to Gypsum's request for its excess insurance carriers to cover asbestos claims.  The court said "A plain reading of the 'other insurance' provision contained in the policies requires Gypsum to exhaust all triggered primary insurance before pursuing coverage under those excess policies."  
Gypsum
, 268 Ill. App. 3d at 654.  The court explained that if Gypsum could pursue coverage from certain excess insurers at the exclusion of others, this would blur the distinction between primary and excess insurance.

Hamilton and Stark write:

"The question remains whether an insured's use of target tenders can be used to circumvent the doctrine of horizontal exhaustion by requiring excess carriers to pay when certain 'deselected' primary insurers have still not paid.

On that note, if 
John Burns
 is taken to its logical conclusion, it seems possible for an insured to deselect all of its primary insurers and tender only to its excess insurers.  The decision could be extended in this manner based on language in 
Alcan
 and 
John Burns
 that suggests the insured has a 'paramount right' to select which insurers should participate in the defense and indemnity of a claim or suit.  Doing so, however, seems to upset the distinction between primary and excess insurers, which the 
Gypsum
 court sought to preserve."  69 Def. Couns. J. at 324.

Hamilton and Stark propound two suggestions as to how courts could analyze the targeted tender rule in a manner that would be consistent with both the theory of horizontal exhaustion and the established relationship between primary and excess insurers:

"The tension between horizontal exhaustion and targeted tender can be addressed by limiting the right of the insured to engage in targeted tenders to only those situations where the insured is named as an additional insured under a concurrent primary policy.  This would confine the doctrine to situations where the facts are similar to those in 
John Burns
.  Thus, in cases where consecutive, rather than concurrent, policies and excess policies are all triggered by the same loss, the insured will have no right to engage in a targeted tender, and there will be no duties between primary and excess carriers, except those arising through contract or equitable subrogation.

These solutions essentially will result in a harmonization of horizontal exhaustion and targeted tender by creating an either/or relationship between the rights guaranteed by each theory.  An insured will have two options: it can either (1) exhaust all primary policies in order to have access to its excess insurance, or (2) engage in a targeted tender and deselect certain insurers, thereby foregoing its excess insurance coverage.  This limitation will preserve the two theories by preventing current underwriting practices--that premiums charged reflect the risk assumed–from being undermined.  In short, the theory of targeted tender must be limited in these ways so as not to 'blur the distinction between primary and excess insurance.' " 69 Def. Couns. J. at 325. 

   I believe that if Illinois retains the targeted tender rule, it should be limited to instances

involving parties which are additional insureds under concurrent primary policies.  This situation is most commonly seen in the context of the construction trade.  When a general contractor hires an independent contractor, the general contractor exposes itself to many risks of liability.  One of the most common of these risks is that the independent contractor may injure a third party or his or her own employee.  When this happens, the general contractor may be found liable based on any of three theories of liability: (1) the general contractor's own fault, usually for failing to properly supervise the independent contractor; (2) vicarious liability for the independent contractor's negligence; or (3) strict liability under a workplace safety statute.  See J. Mathias & T. Burns 
General Contractors and Subcontractors' Insurers: The Additional Insured Provision
, 89 Ill. B. J. 526, (2001).  In order to avoid depleting its own insurance in protecting against these risks, general contractors require their subcontractors to list the general contractor as an additional insured on the subcontractor's insurance policy.  The insurers who insure subcontractors are now certainly well aware that they are facing the likelihood of shouldering the entire risk faced by the additional insured and they may charge the appropriate premium.  Thus, the targeted tender rule will not blindside the insurer.

I also agree with Hamilton and Stark's suggested solution to harmonize the theory of horizontal exhaustion with the targeted tender rule.  By following their recommendation, the important distinction between primary and excess insurers will be maintained.