FIRST DIVISION

No. 1-07-1798

| | | |
|---|---|---|
| STATEWIDE INSURANCE COMPANY and WESTFIELD INSURANCE COMPANY, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellees and Cross-Appellants, | ) ) | |
| v. | ) ) | No. 03 CH 14719 |
| HOUSTON GENERAL INSURANCE COMPANY, | ) ) | Honorable Kathleen M. Pantle, |
| Defendant-Appellant and Cross-Appellee. | ) ) | Judge Presiding. |

JUSTICE LAMPKIN delivered the opinion of the court:

In this insurance coverage dispute among three insurance companies, the trial court granted summary judgment in favor of plaintiff Statewide Insurance Company (Statewide), denied summary judgment in favor of plaintiff Westfield Insurance Company (Westfield), and denied the cross-motion for summary judgment filed by defendant Houston General Insurance Company (Houston General).

On appeal, Houston General argues that the trial court erred in granting summary judgment in favor of Statewide, contending Houston General's insurance policy did not cover the underlying construction-site accident because the coverage could not have been amended without Houston General's consent and a policy endorsement. In the alternative, Houston General argues that summary judgment was improper because there were genuine issues of material fact concerning the insured's desire to reinstate coverage and the effective date of any reinstatement.

Houston General also contends the trial court's award of damages in favor of Statewide failed to consider Westfield's concurrent obligation to defend and indemnify the insured. Furthermore, Houston General challenges the trial court's award of attorney fees and costs to Statewide.

In their cross-appeal, plaintiffs Statewide and Westfield challenge the trial court's ruling that Westfield had an obligation to defend and indemnify the insured, which was based upon the trial court's finding that the insured never deactivated its tender of defense to Westfield.

For the reasons that follow, we affirm the judgment of the trial court granting summary judgment in favor of Statewide and denying summary judgment in favor of Houston General. However, we reverse the trial court's denial of summary judgment in favor of Westfield.

## I. BACKGROUND

This insurance coverage dispute arose after a worker was injured at a high-rise building construction project in December 1997. Joseph Construction Company (JCC) was the general contractor, and Dryden Contractors, Inc. (Dryden), and RC Plumbing, Inc. (RC Plumbing), were two of JCC's subcontractors on that project. JCC was insured by plaintiff Statewide; Dryden was insured by defendant Houston General; and RC Plumbing was insured by plaintiff Westfield. Furthermore, JCC was named as an additional insured on both Dryden's Houston General policies and RC Plumbing's Westfield policies with respect to liability arising out of the subcontractors' ongoing operations performed for JCC. The issues on appeal concern the obligations of Houston General, based on Dryden's insurance, and Westfield, based on RC Plumbing's insurance, to defend and indemnify JCC for the December 1997 loss.

Central to this dispute are the facts concerning Dryden's Houston General insurance. Dryden was owned by Pamela Dryden-Holguin. She had retained J.N. Morcos Insurance Agency and its employee Stephen Morcos to serve as Dryden's insurance broker and procure and manage the necessary insurance for Dryden. Accordingly, Morcos had placed Dryden's insurance coverage with Houston General through Midwest General Underwriters Group (Midwest), Houston General's agent. Dryden's coverage with Houston General included commercial general liability, property, inland marine, commercial automobile and excess liability umbrella. The commercial general liability policy had liability coverage amounts of $1 million per occurrence, with a general aggregate of $2 million for the period of July 30, 1997, through July 30, 1998. The excess liability umbrella form policy had a liability limit of $5 million per occurrence for the same policy period.

On November 10, 1997, Morcos sent by facsimile to Doug Rost of Midwest a memo and five cancellation request/policy release forms signed by Ms. Dryden-Holguin. According to those forms, Dryden was requesting cancellation of its Houston General property, umbrella, general liability, commercial automobile, and inland marine policies effective as of November 15, 1997. Morcos's memo advised Rost that Morcos would send notices to the certificate holders "today," *i.e.*, November 10. However, on November 13, 1997, Morcos sent by facsimile to Rost a memo referencing their earlier discussion and telling Rost to cancel Dryden's property and inland marine policies, but Dryden's general liability, umbrella, and auto liability policies "must remain in force."

On January 16, 1998, Morcos sent Rost a facsimile referencing two cancellation reports

for Dryden's general liability and umbrella policies, which Morcos had received in "today's mail." Morcos reiterated his November 13, 1997 instructions that only Dryden's property and inland marine policies should have been cancelled and "the remainder of the policies should have remained in force." Morcos asked Rost to look into the matter and contact him.

On February 23, 1998, Houston General issued a final audit for Dryden's general liability policy, indicating that Dryden was entitled to a return of $7,396 in paid premiums.

On March 3, 1998, Morcos sent Rost a letter referencing Dryden's general liability, automobile and umbrella policies. Morcos reiterated that those policies should still have been in force and a final audit should not have been conducted yet. Morcos stated that he had been issuing certificates under those policies and collecting premiums. Morcos asked Rost to confirm in writing that he had "taken care of this matter and that the policies are in fact still in force."

On April 1, 1998, Rost sent Morcos a facsimile that referenced Dryden's general liability, automobile, and umbrella policies and stated:

"Please be advised that coverage is in force for the General Liability[,] Hired & Non Owned Auto plus Umbrella. Our accounting department has been advised accordingly.

Sorry for any confusion."

Meanwhile, on December 17, 1997, construction worker Michael McCartin sustained personal injuries while working at JCC's construction project. McCartin filed a lawsuit in December 1999 against JCC alleging negligence, and Statewide retained counsel on behalf of JCC. Later, McCartin amended his complaint, adding Dryden, RC Plumbing and other

4

1-07-1798

defendants.

On September 17, 2001, JCC sent a letter to Houston General and Dryden, tendering its defense of the McCartin lawsuit and requesting that they engage counsel to defend JCC and indemnify it in accordance with their insurance policies. JCC also stated that it had given notice of the claim to Statewide but did not seek indemnification from Statewide at that time. Rather, JCC had asked Statewide to protect its interests until Houston General or Dryden accepted the tender offer.

Also on September 17, 2001, JCC sent a letter to Westfield and RC Plumbing, tendering its defense of the McCartin lawsuit and requesting that they engage counsel to defend JCC and indemnify it in accordance with their insurance policies. JCC also stated that it had given notice of the claim to Statewide but did not seek indemnification from Statewide at that time. Rather, JCC had asked Statewide to protect its interests until Westfield or RC Plumbing accepted the tender offer.

In September 2001, Houston General declined JCC's tender of defense and indemnity on a primary basis, claiming Dryden's general liability policy did not cover McCartin's accident date of December 17, 1997. Houston General, however, would check for coverage under Dryden's umbrella policy but noted that its "only involvement if any would be on an excess basis."

In December 2001, Westfield filed a complaint for declaratory judgment against JCC, Statewide, and McCartin, seeking a finding that Westfield did not owe a duty to defend or indemnify JCC. Specifically, Westfield alleged that it was relieved of any duties to JCC because

5

JCC violated the conditions of insurance by giving Westfield late notice of McCartin's accident and lawsuit.

On March 25, 2003, JCC's counsel sent Houston General a letter explaining that Morcos had provided a document from Midwest showing that Dryden's general liability policy with Houston General was in effect through July 30, 1998. Counsel for JCC concluded that Houston General had a policy in effect on the date of loss and owed coverage to JCC from the date of tender, September 17, 2001. Furthermore, counsel stated that JCC "has de-tendered its defense for [Statewide] and is looking to Houston General to defend and indemnify it exclusively to the limits of its policy."

On March 27, 2003, JCC sent Houston General's counsel a letter stating that JCC was covered as an additional insured under Dryden's Houston General policy, which was in effect on the date of McCartin's accident. JCC stated, "As such, we are de-tendering to [Statewide] and demanding that [Houston General] defend and indemnify [JCC] exclusively."

Houston General did not accept JCC's tender of the defense in the McCartin suit under a reservation of rights and did not file a declaratory judgment action concerning its obligations to JCC.

In September 2003, Statewide filed the complaint for declaratory judgment that is the subject of this appeal. This complaint against Houston General, JCC and McCartin sought a declaration that Houston General had a duty to appear and defend JCC on the McCartin complaint, breached that duty, and was liable for all sums paid and incurred by Statewide in its defense of JCC.

In October 2003, JCC, Statewide and Westfield, in an effort to resolve Westfield's declaratory judgment action, reached a settlement funding agreement and memorialized its terms in a letter dated November 3, 2003. Westfield and Statewide paid $840,000 each for a total of $1.68 million to settle the McCartin suit. Westfield, Statewide and JCC agreed to pursue a suit to recover the settlement payments from Houston General and to share any monies recovered, with Statewide receiving 70% and Westfield receiving 30% of any such recovery. If Statewide recovered the entire amount of its settlement contribution and defense costs incurred in the McCartin suit, then any additional monies recovered would be paid to Westfield. Westfield, JCC and Statewide agreed that $50,000 of Westfield's settlement contribution was allocated to RC Plumbing and represented a good-faith settlement of its potential liability in the McCartin suit. Furthermore, for the purposes of the McCartin suit, it was JCC's express desire that Houston General bear the entire cost of the settlement, and Westfield's and Statewide's payments were made only because Houston General breached its obligations under its insurance policies to JCC as an additional insured. JCC, Westfield and Statewide reserved all their rights to pursue recovery of any settlement payments from any Houston General insurance policy covering JCC for the McCartin suit to the full extent permitted by law.

In April 2004, Statewide amended its complaint for declaratory judgment, adding, *inter alia*, Westfield as an additional plaintiff. Statewide and Westfield sought declarations of their rights with respect to the McCartin lawsuit, equitable subrogation, equitable contribution and unjust enrichment. They sought to recover from Houston General the monies paid in settlement of the McCartin lawsuit on JCC's behalf, and the attorney fees and costs expended in connection

with that litigation.

The parties conducted discovery and deposed several witnesses in 2005 and 2006.

In her deposition, Ms. Dryden-Holguin testified that she was the owner of Dryden and her husband, Armando Holguin, was Dryden's field supervisor. She usually handled the office paperwork, payroll and insurance matters, but she relied on insurance broker Morcos to act as Dryden's agent to procure and manage insurance coverage and ensure that Dryden was covered for any risk. Specifically, she would send Morcos the "insurance part" of Dryden's subcontracts and rely on his expertise to ensure that Dryden had the proper coverage in place. She explained that in November 1997, Dryden went out of business and she had just had a baby. Thereafter, Mr. Holguin likely would have handled any insurance matters. She could not remember if Dryden had any project that would have continued after November 1997, but if some uncompleted work remained, Dryden would have continued carrying insurance after November 1997. When attorneys contacted Ms. Dryden-Holguin for her deposition and asked her about Dryden's 1997 insurance coverage, she was not aware that the policy had been cancelled and reinstated. She also was not aware of McCartin's injury or lawsuit.

In his deposition, Armando Holguin testified that after Dryden went out of business, he continued to operate his own separate construction company, which also used Morcos as an insurance broker. Mr. Holguin acknowledged that his signature appeared on 1998 insurance documents on behalf of Dryden but, given the lapse of time, he did not remember Morcos asking him to sign those documents.

8

In his deposition, Stephen Morcos testified that he secured insurance for Dryden with Houston General through its agent Midwest. As a managing underwriter for Houston General, Midwest had the authority to price, place coverage, issue policies and endorsements on behalf of Houston General, and perform audits. Morcos dealt directly with Doug Rost of Midwest and obtained for Dryden general liability, property, auto, inland marine and umbrella coverage with Houston General. Morcos referred to the Houston General policy as a package policy, *i.e.*, a combination of multiple policies put together.

Morcos testified that he dealt primarily with Ms. Dryden-Holguin until November 1997 when she had a baby and Dryden was wrapping up business. Thereafter, Morcos dealt with Mr. Holguin. In November 1997, Dryden asked Morcos to cancel Dryden's coverage, and Ms. Dryden-Holguin signed the cancellation request forms with an effective date of November 15, 1997. Morcos sent those written cancellation requests to Rost at Midwest on November 10, 1997. Morcos, however, never sent out notices to the certificate holders of any insurance cancellation because he and Dryden reinstated the policies. Specifically, on November 13, 1997, two days before the effective date of the cancellation, Morcos spoke to Rost and sent him revised written instructions to cancel only Dryden's property and inland marine policies, but leave the general liability, auto and umbrella policies (the subject policies) in place. Rost told Morcos that the subject policies remained in force. Furthermore, Rost never told Morcos that it was not possible to cancel certain policies in the package and leave other policies in place. To the best of his recollection, Morcos thought the insurance cancellation instructions changed on November 13, 1997, because Dryden was still wrapping up projects and probably had some operations

going on up until May 15, 1998.

Morcos testified that in late February or early March of 1998, he received a final audit indicating that one of Dryden's subject policies had been cancelled on November 15, 1997. Morcos promptly both wrote and spoke to Rost about that discrepancy, told him the final audit should never have been performed, and requested written confirmation that there was never a lapse in coverage for Dryden's subject policies. Rost procrastinated until April 1, 1998, when he sent Morcos a fax apologizing for any confusion and advising him that Dryden's subject policies were in force and the accounting department had been properly notified. Morcos relied on Rost's statement, understanding that there was never a lapse in coverage in Dryden's subject policies.

Morcos testified that he was not aware of McCartin's injury or lawsuit until attorneys contacted him in 2003 concerning Dryden's coverage under the subject policies. Furthermore, the first time anyone ever indicated to Morcos that coverage under Houston General's package policy could not be split was in January 1999, when Dennis Richards of Midwest sent a fax suggesting that property and inland marine coverage could not be cancelled while just general liability coverage was kept in place.

In his deposition, Doug Rost testified that he was employed by Midwest during the time period relevant to this dispute but then left Midwest shortly after April 1998. Midwest operated as a managing general underwriter for Houston General and, thus, had authority to solicit new business and write insurance coverage, both new and renewal, for clients in the name of Houston General. That relationship, however, ended sometime in 1997. Rost could not recall many of the

events or conversations pertaining to this matter but he testified consistently with Morcos concerning their correspondence in connection with Dryden's Houston General policies. Specifically, Rost testified that when he told Morcos in the memo dated April 1, 1998, that Dryden's subject policies were "in force," Rost "undoubtedly" meant that those policies were in effect "from the time they were issued through at least April 1, 1998."

Rost testified that the coverage in package policies was divisible, so an insured could drop or add coverages during the policy period. Rost thought Morcos's November 13, 1997 request to cancel certain policies but keep others in force was oddly worded because one usually asked to delete a policy line of coverage rather than to cancel a policy. Rost testified that on April 21, 1998, he sent a document to Midwest's accounting department with instructions to reinstate Dryden's subject policies but someone responded that the system would not allow reinstatement of the package policy because a final audit had been entered.

In his deposition, William Walls testified that he was president of Houston General from 1997 to 1999. Midwest was Houston General's exclusive managing general agent in Chicago from 1989 to 1997 and, thus, had underwriting policy processing authority. Houston General terminated its agency agreement with Midwest in 1997, but prior to that termination Midwest did not need to seek Houston General's approval in order to cancel a policy or reinstate a policy that was within Midwest's assigned underwriting authority or established guidelines. Walls testified that, theoretically, an insurance policy could be reinstated after a final audit had been performed.

In May 2006, Statewide and Westfield filed a motion for summary judgment, contending Houston General wrongly and intentionally refused to defend JCC by improperly claiming that

general liability coverage was not in effect at the time of the underlying accident. Thereafter, Houston General filed a cross-motion for summary judgment, contending it had no duty to defend JCC.

On August 31, 2006, the trial court ruled that Houston General owed a duty to defend and indemnify JCC and that Houston General's failure to fulfill that obligation had damaged Statewide. The trial court noted that unresolved questions concerning Westfield's involvement in the underlying suit precluded a full resolution of Statewide and Westfield's summary judgment motion. Furthermore, the trial court denied Houston General's cross-motion for summary judgment.

On March 6, 2007, the trial court ruled that Westfield owed a duty to defend and indemnify JCC because JCC never deactivated its tender to Westfield. The trial court also found that Houston General was not estopped from seeking an allocation of coverage and Houston General's umbrella policy was not triggered by the settlement of the McCartin lawsuit.

On June 5, 2007, the trial court entered judgment in favor of Statewide and against Houston General, ruling that Statewide was entitled to recover: (1) the $840,000 paid in settlement of the McCartin lawsuit; (2) $37,230.05 in defense fees and costs incurred in the underlying litigation; (3) $152,255.39 in prejudgment interest (as of May 8, 2007, at the rate of $120.17 per day from November 18, 2003); and (4) $261,856.60 in attorney fees and costs incurred in prosecuting its declaratory judgment action against Houston General.

Houston General appealed, and Statewide and Westfield cross-appealed.

II. ANALYSIS

On appeal, Houston General contends: (1) it did not owe JCC a duty to defend and indemnify because Dryden's coverage was cancelled before the loss and any attempt to reinstate portions of the package policy constituted an amendment of coverage, which could not have been achieved without Houston General's consent and a policy endorsement; (2) in the alternative, summary judgment was improper because genuine issues of material fact existed concerning Dryden's desire to reinstate coverage and the effective date of any reinstatement; (3) the trial court's award of damages in favor of Statewide failed, *inter alia*, to consider Westfield's concurrent obligation to defend and indemnify JCC; and (4) Statewide was not entitled to attorney fees and costs because JCC did not transfer its right to that recovery to Statewide.

In their cross-appeal, Statewide and Westfield challenge the trial court's ruling that Westfield had an obligation to defend and indemnify JCC where JCC did not deactivate its tender to Westfield.

We review a grant of summary judgment by the trial court *de novo*. Jewelers Mutual Insurance Co. v. Firstar Bank Illinois, 213 Ill. 2d 58, 62 (2004). Summary judgment can only be entered "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006); Prairie v. University of Chicago Hospitals, 298 Ill. App. 3d 316, 319 (1998). The pleadings, depositions and affidavits must be construed most strictly against the moving party and most liberally in favor of the opponent. Purtill v. Hess, 111 Ill. 2d 229, 240 (1986). "[The opponent to summary judgment] need not disprove facts produced by [the moving party], but merely must establish that there is

13

factual evidence showing another version of the relevant events, thus creating a genuine issue as to which version is true." West v. Adelmann, 260 Ill. App. 3d 455, 458-59 (1993). A triable issue exists if fair-minded persons could draw more than one conclusion or inference from the facts, including one unfavorable to the moving party. Lassai v. Holy Cross Hospital, 224 Ill. App. 3d 330, 334 (1991). Summary judgment is a drastic means of disposing of litigation and should only be allowed when the right of the moving party is clear and free from doubt. Loyola Academy v. S&S Roof Maintenance, Inc., 146 Ill. 2d 263, 271 (1992).

### A. Houston General's Duty to JCC

Houston General argues that it did not owe JCC a duty to defend or indemnify because Dryden had cancelled all of its Houston General coverage and any attempt to reinstate only the general liability coverage part without the property and inland marine coverage parts constituted an attempt to change the nature or terms of coverage without Houston General's consent and amendment by a policy endorsement. According to Houston General, it had issued Dryden a commercial multiperil policy, which consisted of general liability coverage, property coverage, and inland marine coverage parts. Houston General claims that Dryden could not fragment or convert that coverage because the policy was a contract and its unambiguous and express language permitted amendment or modification of coverage terms only with Houston General's consent and only when the coverage terms were amended by a policy endorsement issued by Houston General.

Houston General argues that, if coverage was to be reinstated, then all the coverage provided by the commercial multiperil policy had to be reinstated because the different forms of

14

coverage were not provided by separate policies but were part of a package of coverages provided by a single policy. Houston General claims that reinstatement of only the general liability coverage part converted Houston General's commercial multiperil policy, which was providing coverage for three forms of loss, into a monoline policy providing only general liability coverage. Houston General argues that its agency agreement with Midwest did not give it authority to alter the nature or terms of coverage without conforming to policy provisions concerning changes or modifications.

Houston General fails to cite to any relevant policy provision or case law to support its claim that policy packages were not divisible or that certain lines of policy coverage could not be deleted or cancelled. Furthermore, the record refutes that claim where Morcos, Rost and Walls all testified that Midwest had the authority during Dryden's policy period to allow Dryden to cancel or delete certain types of policy coverage but leave other types of policy coverage in place. Because Houston General has failed to support its claim that the reinstatement of Dryden's subject policies constituted an amendment or conversion of its general liability coverage, Houston General's arguments concerning contract interpretation, ambiguous contract terms, express integration clauses, and the use of extrinsic or parole evidence to determine the parties' intent are not relevant.

Dryden and Morcos did not attempt to alter the performance of the contract but, rather, rescinded their earlier order to cancel the subject policies. Furthermore, that rescission was not an attempt to alter the terms of those contracts but, rather, to reinstate their original terms. Moreover, the November 15, 1997 effective date of cancellation had not lapsed when Morcos

rescinded the cancellation order and instructed Midwest to keep the subject policies in force and cancel only the property and inland marine policies.

Contrary to Houston General's assertions on appeal, the dispute before us is not about contract interpretation but, rather, an agent's authority to bind its principal. The trial court granted summary judgment in favor of Statewide based upon the numerous representations of Houston General's agent that Dryden's subject policies were in full force and effect on the date of the loss. Houston General was bound by the acts of its agent Midwest, which had actual and apparent authority to underwrite, bind, cancel and reinstate insurance coverage on Houston General's behalf. See Zannini v. Reliance Insurance Co. of Illinois, Inc., 147 Ill. 2d 437, 452-54 (1992); Dumenric v. Union Oil Co. of California, 238 Ill. App. 3d 208, 215 (1992); State Security Insurance Co. v. Burgos, 145 Ill. 2d 423, 431-32 (1991).

Midwest was Houston General's exclusive managing general agent in Chicago at the time relevant to this dispute. A local business, entity or individual seeking insurance had to contact Midwest in order to obtain any coverage from Houston General. As set forth in detail above, the testimony of Morcos, Rost and Wall established that Rost, as an employee of Midwest, was an agent of Houston General. Furthermore, the combined testimony of Morcos and Rost and their correspondence established that Rost, both verbally and in writing, assured Morcos in November 1997 and early 1998 that Dryden's subject policies were in full force and effect with no gaps in coverage. Rost exercised his actual and apparent authority as Houston General's agent with respect to the subject policies. Therefore, regardless of whether Dryden's original cancellation request, dated November 10, 1997, never took effect, or Rost cancelled and then reinstated the

subject policies, Rost bound Houston General to defend and indemnify JCC in the McCartin suit.

## B. Genuine Issues of Material Fact

Next, Houston General argues that summary judgment in favor of Statewide was error given inconsistent deposition testimony concerning whether Dryden requested reinstatement of coverage and whether coverage was in force on the date of McCartin's injury. The record, however, refutes Houston General's assertion that the deposition testimony was inconsistent on those issues.

According to the record, Ms. Dryden-Holguin relied on Morcos, her agent, to ensure that Dryden had all the necessary insurance coverage in place. Ms. Dryden-Holguin and Morcos both testified that Dryden was going out of business in November 1997 and initially asked Midwest to cancel all of Dryden's coverage with Houston General, effective as of November 15, 1997. However, two days before the effective date of the cancellation, Morcos revised the cancellation request to keep Dryden's subject policies in place. Both Ms. Dryden-Holguin and Morcos indicated that the revised request was done to ensure that Dryden was covered for any ongoing projects.

Furthermore, both Morcos and Rost testified consistently that Rost's April 1, 1998 memo assured Morcos that Dryden's general liability, automobile and umbrella coverages had remained in force since their inception. We find unavailing Houston General's attempt to inject uncertainty into that assurance by noting the absence of specific words about a gap or lapse in

coverage. Prior to April 1, 1998, Morcos had contacted Rost on numerous occasions to clarify the discrepancy in Midwest's records concerning Dryden's insurance coverage and confirm in writing that there was never a lapse in coverage for Dryden's subject policies. After much procrastination, Rost finally provided that confirmation with his April 1, 1998 memo.

The trial court properly granted summary judgment in favor of Statewide because there was no genuine issue of material fact concerning Dryden's desire to reinstate the Houston General subject policies. Furthermore, there was no genuine issue of material fact that Dryden's general liability coverage was in force on the date of McCartin's injury.

### C. Statewide's Damage Award

Houston General challenges the trial court's damage award to Statewide. The record established that Statewide and Westfield each contributed $840,000 to settle the McCartin lawsuit; however, $50,000 of Westfield's contribution was made specifically on behalf of its insured, RC Plumbing, rather than on behalf of JCC, Westfield's additional insured. The trial court ruled that Statewide was entitled to recover from Houston General the $840,000 Statewide paid to settle the McCartin lawsuit.

First, Houston General argues that it was obligated to make Statewide whole only for $815,000, which represents half of the $1,630,000 McCartin settlement. Houston General argues that Westfield had a concurrent obligation to indemnify JCC and cites the "other insurance" language in both Westfield's and Houston General's policies, which provides for equal sharing of the coverage obligation to defend JCC. Houston General complains that Westfield's payment of $50,000 on behalf of RC Plumbing should not be considered in the allocation of indemnification

costs because it reduces Westfield's concurrent obligation to JCC and essentially causes Houston General to contribute to the indemnification of RC Plumbing.

As discussed in detail below, we find that Westfield did not have a duty to defend and indemnify JCC. Furthermore, JCC expressly deactivated its tender of the defense to Statewide, so Statewide should not have paid anything to settle the McCartin lawsuit. Cincinnati Cos. v. West American Insurance Co., 183 Ill. 2d 317, 326 (1998) (when an insured has knowingly chosen to forgo an insurer's assistance by instructing the insurer not to involve itself in the litigation, the insurer is relieved of its obligation to the insured with regard to that claim). The evidence established that Statewide actually paid $840,000 to settle the McCartin lawsuit, and Statewide was entitled to recover what it actually paid. The $50,000 paid by Westfield to settle McCartin's claims against RC Plumbing did not impact or reduce Statewide's damages in any way and, thus, was irrelevant.

Second, Houston General argues that Statewide failed to preserve its right to equitable subrogation of its defense costs against Houston General. This argument lacks merit. Because Houston General breached its duty to defend and indemnify JCC, Houston General is estopped from asserting any policy defenses to coverage such as waiver. Northbrook Property & Casualty Insurance Co. v. United States Fidelity & Guaranty Co., 150 Ill. App. 3d 479, 484-85 (1986). JCC tendered its defense to Houston General twice, and Houston General failed to either seek a declaratory judgment or accept the tender under a reservation of rights. That refusal by JCC was at its own peril. Furthermore, in the settlement funding agreement, Statewide specifically

reserved its right to recover the entire amount of its settlement contribution and its defense costs incurred in the McCartin suit.

Third, Houston General argues that even if Statewide is entitled to recover its defense costs, it is not entitled to recover the $37,230.05 awarded by the trial court because Houston General's duty to defend was not triggered until September 17, 2001, and the only proper award for defense costs is one half of the defense costs incurred after September 17, 2001. Houston General fails to present this court with a cogent argument supported by citation to the record or any relevant authority. We conclude that Houston General is not entitled to a reduction of Statewide's defense costs because Statewide was entitled to reimbursement from Houston General of the defense costs it actually paid in defending the McCartin suit.

Finally, Houston General's challenge to Statewide's award of $152,255.39 in prejudgment interest is meritless. Houston General failed to fulfill its duty to defend and indemnify JCC. Therefore, the award of prejudgment interest to Statewide was proper. See 815 ILCS 205/2 (West 2006); La Grange Memorial Hospital v. St. Paul Insurance Co., 317 Ill. App. 3d 863, 873-74 (2000); Marcheschi v. Illinois Farmers Insurance Co., 298 Ill. App. 3d 306, 313 (1998). The decision to award prejudgment interest under section 2 of the Illinois Interest Act (815 ILCS 205/2 (West 2006)) is within the circuit court's sound discretion and will not be reversed absent an abuse of discretion. After reviewing the record, there is no evidence to suggest an abuse of discretion by the trial court in deciding to award prejudgment interest. Furthermore, any concurrent obligation by Westfield to defend JCC would not be relevant on this issue, because

20

the prejudgment interest awarded to Statewide was based on the $840,000 in damages Statewide actually incurred based on Houston's General's improper refusal to defend and indemnify JCC in the McCartin suit.

We conclude that the trial court properly assessed Statewide's damages, defense costs and prejudgment interest against Houston General.

### D. Statewide's Attorney Fees and Costs

Houston General argues that Statewide was not entitled, under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2006)), to recover $261,856.60 in attorney fees and costs incurred in prosecuting its declaratory judgment action against Houston General. The granting of attorney fees and penalties pursuant to section 155 is usually entrusted to the sound discretion of the trial court (Meier v. Aetna Life & Casualty Standard Fire Insurance Co., 149 Ill. App. 3d 932, 940 (1986)); however, when section 155 fees and costs are awarded as a judgment on the pleadings, the standard of review is *de novo* (Employers Insurance of Wausau v. Ehlco Liquidating Trust, 186 Ill. 2d 127, 160 (1999)). A court may award reasonable attorney fees and other costs for a vexatious and unreasonable action by or against a company where there is an issue of the liability of a company on an insurance policy or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim. 215 ILCS 5/155 (West 2006). One purpose of the remedy is to "punish insurance companies for misconduct." McGee v. State Farm Fire & Casualty Co., 315 Ill. App. 3d 673, 681 (2000). A court should consider the totality of the circumstances when deciding whether an insurer's conduct is vexatious and unreasonable,

including the insurer's attitude, whether the insured was forced to sue to recover, and whether the insured was deprived of the use of his property. McGee, 315 Ill. App. 3d at 681. If a *bona fide* coverage dispute exists, an insurer's delay in settling a claim will not be deemed vexatious or unreasonable for purposes of section 155 sanctions. Baxter International, Inc. v. American Guarantee & Liability Insurance Co., 369 Ill. App. 3d 700, 710 (2006).

Houston General argues that section 155 was not intended to give insurance companies the means to recover costs incurred in securing coverage for its insured against another insurer. According to Houston General, the intent of section 155 was limited to giving the policyholder an extracontractual remedy against its insurer when that insurer acted vexatiously and unreasonably in refusing to defend the policy holder. Houston General asserts that Statewide's policy provided merely for the assignment of JCC's right to recover payments it was otherwise entitled to receive under the policy; it did not transfer the right to seek recovery of payments made by Statewide that were extraneous to the policy's coverage or made solely for Statewide's benefit. According to Houston General, an award to Statewide under section 155 was unnecessary because JCC did not need to be made whole.

Section 155 permits the court to award reasonable attorney fees and costs to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits. Garcia v. Lovellette, 265 Ill. App. 3d 724, 728 (1994). "As a general rule, the remedy embodied in section 155 of the Insurance Code extends only to the party insured (Stamps v. Caldwell, 133 Ill. App. 2d 524, 528 (1971)) and policy assignees (see Loyola University Medical Center v. Med Care HMO, 180 Ill. App. 3d 471, 479-81 (1989); Aabye v. Security-Connecticut Life Insurance Co., 586 F.

22

Supp. 5 (N.D.Ill. 1984))"; it does not extend to third parties. Yassin v. Certified Grocers of Illinois, Inc., 133 Ill. 2d 458, 466 (1990).

Contrary to Houston General's argument on appeal, the remedy under section 155 is intended for the protection of both the insured and the assignee who succeeds to the insured's position. Yassin, 133 Ill. 2d at 466; Peerless Enterprises, Inc. v. Kruse, 317 Ill. App. 3d 133, 144 (2000); Garcia, 265 Ill. App. 3d at 728; Loyola University Medical Center, 180 Ill. App.3d at 480. When an insured or its assignee must bring a declaratory judgment action against the insurer to enforce its right to coverage, the insured may recover section 155 attorney fees incurred in both the underlying suit and the declaratory action. Mobil Oil Corp. v. Maryland Casualty Co., 288 Ill. App. 3d 743, 757 (1997).

Statewide's policy contained a provision whereby JCC transferred any and all rights to recovery to Statewide when it made a payment under the policy to settle the McCartin lawsuit. Furthermore, the terms of the settlement funding agreement established that Statewide was JCC's assignee. As the assignee of JCC, Statewide succeeded to the same position as JCC and, therefore, was entitled to recover attorney fees if Houston General's actions were vexatious and unreasonable. We note that the trial court's award to Statewide of section 155 attorney fees and costs represented a 30% reduction of Statewide's total fees and costs in accordance with the terms of Statewide and Westfield's settlement funding agreement.

We agree with the trial court's ruling that the award of attorney fees was reasonable where Houston General twice failed to defend or indemnify JCC after JCC selectively tendered to it, failed to defend under a reservation of rights, and failed to file a declaratory judgment action

concerning its obligations. Furthermore, as discussed above, the record clearly established that Houston General did not have a *bona fide* coverage dispute. Houston General denied coverage despite clear evidence that its agent gave Dryden repeated assurances that its subject policies were in force. In addition, it would be inequitable to force Statewide to absorb attorney fees for a matter it had no obligation to defend.

The dissent states that section 155's remedy is limited to an insured at risk of being a judgment debtor in a garnishment action, but the unambiguous language of the statute does not suggest any such limitation. The dissent also maintains that JCC's assignment to Statewide shifted the risk Statewide had assumed under the policy it issued to JCC, speculates that much mischief could ensue from such an assignment, and concludes that JCC's assignment to Statewide should not be rewarded with section 155 attorney fees and costs. The dissent, however, ignores the fact that Statewide did not have an obligation to defend and indemnify JCC because JCC, in accordance with Illinois' selective tender rule, targeted Houston General. Furthermore, this court has recognized that "permitting assignments between an insured and an insurance company both encourages the early settlement of lawsuits and relieves our overburdened court system." Daugherty v. Blaase, 191 Ill. App. 3d 496, 499-500 (1989) (favorably citing the reasoning in Hartford Casualty Insurance Co. v. Argonaut-Midwest Insurance Co., 854 F.2d 279, 281-83 (7th Cir. 1988), which commended the insurer's willingness to settle a claim when it was not obligated to do so and noted the presumption in favor of enforcing contracts like assignments and the preference for suits between insurance companies as opposed to those initiated by the insureds).

Houston General's unreasonable and vexatious conduct supports Statewide's request that

this court award it the fees incurred in defending this appeal. See Rosenberg v. Lincoln American Life Insurance Co., 883 F.2d 1328, 1340 (7th Cir. 1989) (finding section 155 covers both trials and appeals); Meier, 149 Ill. App. 3d at 943 (granting fees on appeal where the insurer's violation of section 155 was clear and the insurer failed to introduce any evidence or argument on appeal to justify such misconduct). We award fees and costs of appeal to Statewide and remand the cause to the trial court for the taking of evidence for a determination of reasonable attorney fees and costs.

### E. Westfield's Duty to JCC

In their cross-appeal, plaintiffs Statewide and Westfield argue that JCC deactivated its tender to Westfield, so Westfield did not have a concurrent duty to defend and indemnify JCC and was damaged by Houston General's conduct. Plaintiffs argue that JCC's March 2003 correspondence to Houston General and the November 2003 settlement funding agreement made clear JCC's intention that Houston General exclusively defend and indemnify JCC and that JCC was not looking to any other insurers for coverage.

When several insurance polices are available to the insured, that insured has the paramount right to choose or knowingly forgo an insurer's participation in a claim. John Burns Construction Co. v. Indiana Insurance Co., 189 Ill. 2d 570, 574-76 (2000) (insured general contractor had the right to select a single carrier to provide exclusive coverage for a loss); American National Fire Insurance Co. v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, 343 Ill. App. 3d 93, 101 (2003) (general contractor had the right to choose between three insurers to defend and indemnify it where the general contractor was the named insured on its own policy and the

additional insured on two subcontractors' policies). The insured may choose to forgo an insurer's assistance for various reasons, such as the insured's fear that premiums would be increased or the policy cancelled in the future, and the insured's ability to forgo a particular insurer's assistance should be protected. Cincinnati Cos., 183 Ill. 2d at 326. The insured's right to choose encompasses the right to deactivate coverage with an insurer previously selected for purposes of invoking exclusive coverage with another insurer. Alcan United, Inc. v. West Bend Mutual Insurance Co., 303 Ill. App. 3d 72, 83 (1999); Richard Marker Associates v. Pekin Insurance Co., 318 Ill. App. 3d 1137, 1143 (2001).

Our courts have chosen to protect the insured's right to choose coverage for a claim with one insurer and knowingly forgo the coverage of another insurer despite the fact that "prejudice inescapably results" from such a choice. Richard Marker Associates, 318 Ill. App. 3d at 1144. The insured's right to choose, however, has some limits. If defense and indemnity costs exceed the primary limits of the selected insurer's policy, then the primary policy of the deselected insurer or insurers must answer for the loss before the insured can seek coverage under an excess policy. Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co., 227 Ill. 2d 102, 117 (2007). Furthermore, the selective tender rule was not extended to situations involving an insured under an automobile policy because, *inter alia*, to do so would contravene the public policy contained in statutes mandating insurance coverage. Pekin Insurance Co. v. Fidelity & Guaranty Insurance Co., 357 Ill. App. 3d 891, 902-03 (2005).

When an insured tenders its defense to multiple insurers who provide concurrent coverage, the insurers may seek equitable contribution from each other (Alcan United, Inc., 303 Ill. App. 3d

26

at 81); but if the insured selectively tenders a claim to one insurer alone, the duty to defend and indemnify remains on the targeted insurer, and that insurer is precluded from seeking equitable contribution (John Burns Construction Co., 189 Ill. 2d at 578; Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange, 325 Ill. App. 3d 970, 976 (2001)). "When an insured has knowingly chosen to forgo an insurer's assistance by instructing the insurer not to involve itself in the litigation, the insurer is relieved of its obligation to the insured with regard to that claim." Legion Insurance Co. v. Empire Fire & Marine Insurance Co., 354 Ill. App. 3d 699, 704 (2005), citing Cincinnati Cos., 183 Ill. 2d at 326. "The duty to defend may be discharged simply by contacting the insured to ascertain whether the insurer's assistance is desired." Cincinnati Cos., 183 Ill. 2d at 326. Furthermore, the insured may detender his defense and forgo coverage even after settlement of the underlying dispute. Richard Marker Associates, 318 Ill. App. 3d at 1143-44.

Here, JCC, in September 2001, initially tendered its defense of the McCartin lawsuit to both Westfield and Houston General and informed them that, although Statewide was given notice of the claim, JCC but did not seek indemnification from Statewide at that time. In response, to those letters, Westfield sought a declaratory judgment that it had no duty to defend, and Houston General neither accepted the tender under a reservation of rights nor sought a declaratory judgment concerning its obligations.

On March 25, 2003, JCC sent Houston General a letter stating that it had detendered its defense for Statewide and looked to Houston General to defend and indemnify it "exclusively." That letter, however, made no mention of Westfield. Then, on March 27, 2003, JCC sent Houston

27

General another letter stating that it had detendered its defense for Statewide and looked to Houston General to defend and indemnify it "exclusively." Westfield again was not mentioned.

Although JCC's March 2003 letters to Houston General expressly deactivated JCC's previous tender to Statewide, those letters never expressly indicated that JCC wanted to deactivate its previous tender to Westfield or did not want Westfield's assistance in the McCartin action. Moreover, JCC's statements that it wanted Houston General to defend it "exclusively," were made only in the context of discussions concerning Houston General and Statewide. JCC did not clearly state that it tendered to Houston General to the exclusion of *both* Statewide *and* Westfield. Thus, JCC's March 2003 letters did not deactivate its previous tender to Westfield.

However, JCC expressed its desire to detender Westfield in its subsequent actions. Specifically, in October 2003, JCC, Statewide and Westfield reached a settlement agreement that resolved Westfield's pending declaratory judgment action, which had alleged that Westfield did not owe a duty to JCC due to a breach of policy notice conditions. Their settlement funding agreement expressly stated that JCC wanted Houston General to bear the entire cost of the McCartin settlement and Statewide's and Westfield's payments were made only because Houston General had breached its obligations. Specifically, that settlement agreement provided, in part, as follows:

> "2. [Houston General], the insurer of Dryden Contractors, has refused to participate in settlement. Therefore, Westfield, Statewide and [JCC] shall pursue a suit to recover any settlement payments made pursuant to this agreement from Houston General to the full extent permitted by law. ***

* * *

7. For the purposes of the *McCartin* suit, it is the express desire of [JCC] that the entire cost of any settlement be borne by [Houston General]. Any payments made by Westfield and Statewide, as set forth herein, will be made only because Houston General has breached its obligations to [JCC] under its policies of insurance, on which [JCC] is an additional insured or insured. [JCC], Westfield and Statewide reserve all of their rights to pursue recovery of any settlement payments from any and all policies of insurance which Houston General issued and which cover or potentially cover [JCC] for the *McCartin* suit, to the full extent permitted by law." (Emphasis added.)

The above-quoted unequivocal language notified Westfield that JCC was deactivating its tender to Westfield and exclusively targeting Houston General as JCC's sole insurer. Westfield's duty was then only to provide standby coverage because Houston General had refused to defend and indemnify. In addition, the parties' subsequent actions were consistent with JCC's manifested desire to detender Westfield where, in April 2004, Statewide amended its complaint for declaratory judgment and added Westfield as a plaintiff, both individually and as a subrogee of JCC. The allegations of the amended complaint expressed the parties' clear intent that Westfield should not be responsible for JCC's defense and settlement costs in the McCartin lawsuit.

The settlement funding agreement left no doubt of JCC's decision to knowingly forgo Westfield's triggered coverage. We, therefore, reverse the trial court's ruling that JCC never deactivated its tender to Westfield and grant summary judgment in favor of Westfield. Because

JCC deactivated its tender to Westfield, Westfield did not have a concurrent obligation to defend and indemnify JCC until the limits of Houston General's primary policy was exhausted. Thus, Westfield was damaged when it was forced to participate in the McCartin lawsuit and fund the settlement on behalf of JCC. Consequently, we remand this matter to the trial court for a determination of Westfield's damages. Due to the deactivated tender of Westfield, Houston General cannot seek an equitable allocation of coverage from Westfield or contribution based on an "other insurance" policy provision. See John Burns Construction Co., 189 Ill. 2d at 578; Bituminous Casualty Corp. v. Royal Insurance Co., 301 Ill. App. 3d 720, 725 (1998).

### III. CONCLUSION

The trial court's orders granting summary judgment in favor of Statewide and denying summary judgment in favor of Houston General are affirmed. However, we reverse the trial court's order denying summary judgment in favor of Westfield. We remand this matter to the trial court for a determination of Westfield's damages. Furthermore, we affirm the trial court's award of damages, fees and costs to Statewide. We also award Statewide the attorney fees and costs it unnecessarily incurred as a result of Houston General pursuing this appeal and remand the cause to the trial court to take evidence for a determination of reasonable appellate fees and costs.

Affirmed in part and reversed in part; cause remanded.

PATTI, J., concurs.

GARCIA, J., concurs in part and dissents in part.

JUSTICE GARCIA, dissenting in part:

I disagree with sections D and E of the majority opinion.

Statewide's Attorney Fees and Costs

I do not agree that because the settlement funding agreement declares Statewide to be an "assignee" of JCC, Statewide may therefore stand in the shoes of JCC for purposes of seeking sanctions under section 155 of the Insurance Code (215 ILCS 5/155 (West 2006)). The case the majority cites for this proposition, Peerless Enterprises, Inc. v. Kruse, 317 Ill. App. 3d 133, 142, 738 N.E.2d 988 (2000), concerns an assignment from a judgment debtor to a judgment creditor in the course of a garnishment proceeding. "[The judgment debtor] assigned his rights under the insurance contract to [the judgment creditor.]" Peerless Enterprises Inc., 317 Ill. App. 3d at 142. To state the obvious, JCC is not a judgment debtor to Statewide; nor can the circumstances of this case give rise to an indebtedness that would flow from JCC to Statewide so as to allow Statewide to stand in the shoes of JCC based on the same relationship of the parties in Peerless Enterprises, Inc. It follows, of course, that there are no circumstances under which Statewide could assume the role of judgment creditor to JCC. Cf. Loyola University Medical Center v. Med Care HMO, 180 Ill. App. 3d 471, 481, 535 N.E.2d 1125 (1989) (provider of medical services "became the

31

'insured' " upon assignment from original insured).

Under the facts of this case, I see no reason to expand the scope of protection afforded by section 155 to Statewide simply because it shares JCC as an insured with Houston General. Stated differently, I am unpersuaded that sanctions provided for in section 155 for the insured's protection were meant to benefit an insurance company, which must itself provide coverage to the insured from which it received the assigned claim under a separate policy. See Estate of Price v. Universal Casualty Co., 334 Ill. App. 3d 1010, 1016, 779 N.E.2d 384 (2002) ("The purpose of section 155 is to discourage the insurer from using its superior financial position to profit at the insured's expense").

Under the Statewide policy, JCC was the primary insured. Under the Houston General policy, JCC, the general contractor, was an additional insured to Dryden, the primary insured and subcontractor. While it is not clear from the record before us, it is reasonable to conclude that Houston General, as the issuer of the commercial general policy to Dryden, "craft[ed] its policy to limit coverage to the additional insureds to negligence resulting from the primary insured's work." National Fire Insurance of Hartford v. Walsh Construction, 392 Ill. App. 3d 312, 315, 909 N.E.2d 285 (2009). As an additional insured under the Houston General policy, JCC was covered only for an insurable event connected to Dryden's own work. Thus, the two policies do not cover the identical loss. Under the Houston General policy, the loss had to be triggered by Dryden's own work; under the Statewide policy, the loss had to be triggered by JCC's work. Different interests were covered by the two policies. See National Fire Insurance, 392 Ill. App. 3d at 314 (tender properly rejected by subcontractor's insurer where "the complaint made no allegation of

negligence on the part of [the subcontractor]").

I submit that Statewide, contractually obligated to provide a defense to JCC under its own policy, falls outside the set of insureds (or their assignees) intended to be protected by section 155 against a separate insurer's purported vexatious delay, when the assignee does not succeed to "the same position of the insured" under the disputed policy. Garcia v. Lovellette, 265 Ill. App. 3d 724, 728, 639 N.E.2d 935 (1994). See Richardson v. Illinois Power Co., 217 Ill. App. 3d 708, 711, 577 N.E.2d 823 (1991) (by the enactment of section 155 of the Insurance Code, "[t]he legislature intended to provide a remedy to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits"); Stamps v. Caldwell, 133 Ill. App. 2d 524, 528, 273 N.E.2d 524 (1971) ("Section 155 of the Illinois Insurance Code *** is designed to protect insured parties who are forced to expend attorneys' fees where the insurer refuses to pay under the terms of the policy"). The aim of section 155 is clear: to sanction an insurer "when it fails to provide one of the most important benefits of a liability policy-a defense." Richardson, 217 Ill. App. 3d at 711. Based on the wrongful denial of this most important benefit of a liability policy, I submit the protection afforded by section 155 is limited to an insured that might otherwise face the risk of becoming a "judgment debtor" in a garnishment action, should judgment be entered in favor of the party filing suit against the putative insured. See Peerless Enterprises, Inc., 317 Ill. App. 3d at 142. When the judgment creditor is assigned the benefits of the insurance policy from the judgment debtor, the consideration from the judgment debtor is clear. In the context of this case, the assignment from JCC to Statewide of whatever rights it had under the policy issued by Houston General strikes me as nothing more than a shifting of the risks Statewide had assumed

33

from the issuance of its own policy to JCC. I submit much mischief can ensue from such an assignment. See BHI Corp. v. Litgen Concrete Cutting & Coring Co., 214 Ill. 2d 356, 827 N.E.2d 435 (2005) (settlement agreements that provided for assignments of plaintiffs' remaining claims not made in good faith; therefore, the assigned claims could not be pursued). Under well established case law, Houston General is precluded from asserting any policy defenses it may have to the claim by JCC because it failed to file a reservation of rights or seek a declaratory judgment as to its duties to JCC. See State Farm Fire & Casualty Company v. Martin, 186 Ill. 2d 367, 371, 710 N.E.2d 1228 (1999) ("If insurer fails to take either of these actions, it will be estopped from later raising policy defenses to coverage"). In light of this substantial penalty imposed on Houston General, I see no good reason to open the door still further and allow Statewide, a fellow insurer, to recoup attorney fees and costs from Houston General on a claim of vexatious and unreasonable delay to Statewide's insured based on a bald assignment from JCC.

The assignment in this case should not be rewarded by upholding an award under section 155 of the Insurance Code between two insurers, each equally obligated to provide a defense to the insured. I dissent from that portion of the majority's decision.

### Westfield's Duty to JCC

My disagreement with the majority's position on this issue stems from the relationship between JCC and the two insurers, Westfield and Houston General. JCC is the additional insured under both the Westfield insurance policy and the policy issued by Houston General. That JCC is an additional insured under each policy with different primary insureds makes this case different from the line of cases the majority relies on to reach its conclusion that "JCC deactivated its

tender to Westfield." Slip op. at 29. I do not believe JCC had the "right to choose or knowingly forgo an insurer's participation in a claim" (slip op. at 25) where McCartin's claim triggered distinct policies covering different subcontractors. The reasons given for recognizing that "[t]he insured may choose to forgo an insurer's assistance for various reasons, such as the insured's fear that premiums would be increased or the policy cancelled in the future, and the insured's ability to forgo a particular insurer's assistance should be protected," as the majority writes (slip op. at 25), ring hollow when the insured in this case is an additional insured under two different policies. Under the circumstances of this case, I am unpersuaded that the factors set out by the supreme court in Cincinnati Cos. v. West American Insurance Co., 183 Ill. 2d 317, 326, 701 N.E.2d 499 (1998), have any application to the general contractor as an additional insured under distinct policies issued to different subcontractors triggered by a common occurrence.

Under the Westfield policy, the primary insured is RC Plumbing; under the Houston General policy, the primary insured is Dryden. Essentially, this case involves subcontractors whose negligence allegedly caused or contributed to McCartin's injuries; this is not a case where JCC has several insurance policies available covering the same alleged loss. See John Burns Construction Co. v. Indiana Insurance Co., 189 Ill. 2d 570, 576, 727 N.E.2d 211 (2000) (" 'if the policy is never triggered, the issue of liability under the 'other insurance' clause does not arise' ", quoting Institute of London Underwriters v. Hartford Fire Insurance Co., 234 Ill. App. 3d 70, 77, 599 N.E.2d 1311 (1970).

The distinction between this case and the cases relied upon by the majority is that in this case the two policies, one from Westfield, the other from Houston General, were each triggered by

35

the underlying occurrence, making each a co-insurer. "It is only when an insurer's policy is triggered that the insurer becomes liable for the defense and indemnity costs of a claim and it becomes necessary to allocate the loss among co-insurers. The loss will be allocated according to the terms of the 'other insurance' clauses, if any, in the policies that have been triggered. As discussed above, [the general contractor's] policy was not triggered and its obligation to defend and indemnify [the general contractor] with regard to the [injured party's] lawsuit was excused by the targeted tender to [the subcontractor's insurer]." Bituminous Casualty Corp. v. Royal Insurance Co. of America, 301 Ill. App. 3d 720, 726, 704 N.E.2d 74 (1998), cited with approval in John Burns Construction Co., 189 Ill. 2d at 577. I read our supreme court's statement in John Burns Construction Co., "that the presence of the 'other insurance' provision in the [subcontractor's] policy [does not] serve[] by itself to trigger the coverage afforded by [the general contractor's] policy" to mean that an insured occurrence may trigger coverage under distinct policies issued by co-insurers. John Burns Construction Co., 189 Ill. 2d at 578.

Because neither RC Plumbing nor Dryden may avoid liability for the insured occurrence if they each contributed to McCartin's injuries--that is, the primary insured under distinct policies may not avoid its shared liability--it follows that the additional insured under the distinct policies may not absolve the liability of one subcontractor to the detriment of another when the respective liabilities arise independently of each other. I submit that JCC, as the additional insured under distinct commercial general liability policies, has no authority under cases decided to date, to place the tort liability arising from RC Plumbing's contribution to McCartin's injury at the feet of Dryden. Nor am I persuaded that we should so decide in this case.

36

I read the circuit court's denial of summary judgment to Westfield to reflect Westfield's involvement in the case was triggered by the alleged liability of its primary insured, RC Plumbing, which in turn triggered coverage for its additional insured JCC under the Westfield policy. I am unpersuaded that because the McCartin lawsuit alleged potential liability against two subcontractors, each of whom obtained a liability policy protecting JCC as an additional insured, the two policies issued by two different insurance companies may be effectively merged into shared coverage for the benefit of JCC. It seems beyond contention that each of the policies, Houston General's issued to Dryden and Westfield's issued to RC Plumbing, provide coverage for losses only where the loss stems from the alleged negligence of the respective primary insured, Dryden or RC Plumbing. Assuming McCartin's claim fell under both the Houston General policy and the Westfield policy, I am unconvinced that because JCC is an additional insured under both policies, JCC may allocate the duty to defend and the duty to indemnify to only Houston General. I agree with the issue as framed by Judge Quinn in the circuit court below: "[I]f Statewide and Westfield evenly split the defense and settlement of the McCartin case, is Westfield damaged by the fact that the split should instead have been with Houston General [instead of Statewide]?" My answer is No.

Under the facts of this case, I believe there is no "paramount *** right of the insured to elect which of its insurers would defend a particular claim." Richard Marker Associates v. Pekin Insurance Co., 318 Ill. App. 3d 1137, 1142, 743 N.E.2d 1078 (2001). This is so under the facts of this case because the choice is **not** between "contemporaneous coverage from both [Westfield] and [Houston General]." Richard Marker Associates, 318 Ill. App. 3d at 1143. The coverage is

not contemporaneous because the triggering occurrence under the distinct policies must in each instance be linked to the work of the primary insured, either Dryden or RC Plumbing, or both. I submit JCC can no more "deactivate" the tender to Westfield based on an occurrence that triggered the coverage provided to RC Plumbing than JCC can decide that liability arising from the triggering event should fall solely on the shoulders of Dryden. As the circuit court made clear below, there is a concurrent duty to defend and indemnify JCC on the part of both Westfield and Houston General.

To be clear, the position I take is not based on "prejudice" to Houston General arising from JCC's decision seeking to shift liability to Houston General only, as the Second District discussed the term in Richard Marker Associates, 318 Ill. App. 3d at 1144; rather, it is liability for the underlying occurrence under each subcontractor's policy that determines whether one or both policies have been triggered. I submit that each policy may be triggered by a loss attributable to each primary insured, RC Plumbing and Dryden. Where the loss is attributable to the primary insured of two distinct policies, then the two policies are necessarily triggered. As the Second District recognized, "an insurer's liability results from the insurance contract, for which the insurer receives consideration." Richard Marker Associates, 318 Ill. App. 3d at 1144. The insurance contract between RC Plumbing and Westfield covered only liability arising from RC Plumbing's work for JCC, with the policy providing coverage to JCC as an additional insured. The insurance contract between Dryden and Houston General covered only liability arising from Dryden's work for JCC, with the policy providing coverage to JCC as an additional insured. There is no insurance contract from Westfield that covered JCC for Dryden's work; nor is there an

38

insurance contract from Houston General that covered JCC for RC Plumbing's work. As to the underlying occurrence, the two policies were triggered. The indisputable fact remains that while JCC was provided coverage under the distinct policies issued by Westfield and Houston General, the policies did not provide the same coverage.

I cannot agree with the majority that "Westfield did not have a concurrent obligation to defend and indemnify JCC." Slip op. at 29. Therefore, I dissent from the majority's entry of summary judgment in favor of Westfield.

No. 1-07-1798

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

---

STATEWIDE INSURANCE COMPANY and WESTFIELD INSURANCE COMPANY,

Plaintiffs-Appellees and Cross-Appellants,

v.

HOUSTON GENERAL INSURANCE COMPANY,

Defendant-Appellant and Cross-Appellee.

---

No. 1-07-1798

Appellate Court of Illinois
First District, FIRST DIVISION

December 14, 2009

---

Justice Bertina E. Lampkin authored the opinion of the court:

Justice Patti concurs.

Justice Garcia concurs in part and dissents in part.

---

Appeal from the Circuit Court of Cook County.
The Hon. Kathleen M. Pantle, Judge Presiding.

---

**COUNSEL FOR APPELLANT and CROSS-APPELLEE**
The Law Offices of Wolf & Wolfe, Ltd., Chicago, IL 60602
OF COUNSEL: Patrick R. Grady

**COUNSEL FOR APPELLEES and CROSS-APPELLANTS**
Freeborn & Peters LLP, Chicago, IL 60606
OF COUNSEL: David C. Gustman, Robert M. Baratta, Jr.,
Catherine A. Miller and John C. Hammerle